UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| NATALIE MARIE TURK, | ) |  |
|---|---|---|
| Plaintiff, | ) ) ) |  |
| v. | ) ) | CAUSE NO. 1:09-CV-00303 |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | ) ) ) |  |
| Defendant. | ) ) |  |

## OPINION AND ORDER

Plaintiff Natalie Turk appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED for further proceedings in accordance with this Opinion and Order.

### I. PROCEDURAL HISTORY

Turk applied for DIB and SSI in February 2006, alleging that she became disabled on November 1, 1995.[2] (Tr. 81-83, 582-85.) The Commissioner denied her application initially and upon reconsideration, and Turk requested an administrative hearing. (Tr. 39-40, 59-61, 63-66, 571-77.) A hearing was conducted by Administrative Law Judge ("ALJ") Terry Miller on June

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

[2] Apparently, this is Turk's fourth application for disability benefits. (Tr. 34.)

24, 2008, at which Turk (who was represented by counsel), her husband, her mother, and a vocational expert ("VE") testified. (Tr. 607-61.) At the hearing, Turk amended her alleged onset date to March 10, 2006, the last date she worked. (Tr. 610-11.)

On February 17, 2009, the ALJ rendered an unfavorable decision to Turk, concluding that she was not disabled because she could perform a significant number of jobs in the economy despite the limitations caused by her impairments. (Tr. 25-36.) The Appeals Council denied Turk's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 4-21.) Turk filed a complaint with this Court on October 30, 2009, seeking relief from the Commissioner's final decision. (Docket # 1.)

## II. TURK'S ARGUMENTS

Turk alleges three flaws with the Commissioner's final decision. Specifically, Turk claims that the ALJ (1) improperly evaluated the credibility of her symptom testimony; (2) improperly considered the opinion of her treating neurologist, Dr. Madhav Bhat; and (3) committed legal error by failing to use the "special technique" to assess her mental impairments. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 16-24.)

## III. FACTUAL BACKGROUND[3]

### *A. Background*

At the time of the ALJ's decision, Turk was twenty-nine years old; had a high school education and one year of college; and possessed work experience as a pharmacy worker, childcare giver, and cashier. (Tr. 36, 76, 107, 163, 609.) Turk alleges that she became disabled as of March 10, 2006, due to relapsing-remitting multiple sclerosis ("MS"), major depression,

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 661-page administrative record necessary to the decision.

and obesity. (Opening Br. 2.)

### B. *Turk's Testimony at the Hearing*

At the hearing, Turk testified that she lives with her husband, her nine-year-old son, and her parents in a two-story home. (Tr. 618.) She is independent with showering and dressing, though she often has to lean against walls or furniture to maintain her balance while performing these activities. (Tr. 625, 632, 636.) Her mother performs most household chores, but Turk helps "[a] little bit" with meal preparation, laundry, dusting, and sweeping, and goes grocery shopping with her once a week. (Tr. 633.) When her son is at school, she naps four hours a day. (Tr. 619.) Turk said that she does not like to be around people so she stays home most of the time. (Tr. 628.) She does, however, drive her son to baseball three days a week and watches his one-hour games. (Tr. 630, 637-38.)

Turk testified that her MS causes her to experience fatigue, arm and leg pain, leg numbness, stiffness of the muscles, and balance problems. (Tr. 614-15.) She described her arm and leg pain as a "sharp throbbing pain" and rated it as a "seven" on a scale of "one" to "ten", adding that it rises to a "nine" three or four times a week. (Tr. 615-16.) She stated that she could walk about ten minutes before her legs go numb, a condition which has twice recently caused her to fall. (Tr. 614, 621.) Turk further reported that she could stand for ten minutes and sit for fifteen to twenty minutes before needing to change position. (Tr. 616, 622.) She represented that she could carry ten pounds, but that she has trouble gripping with her right hand and frequently drops items. (Tr. 623.) She stated that using a computer causes her hands to go numb. (Tr. 624.)

Turk testified that she takes daily injections of Copaxone[4] for her MS, and Ibuprofen for pain. (Tr. 616-17, 619.) Her doctor recommended that she exercise but she does not comply because of the pain and numbness in her arms and legs. (Tr. 618.)

As to her mental status, Turk testified that she is forgetful and has difficulty maintaining concentration, keeping a checkbook, and following directions when driving. (Tr. 626, 640-41.) She takes medication for bipolar disorder and depression, and recently started attending counseling. (Tr. 627.) She believes that the medications are helpful in that she is not "flying off the handle as much as [she] used to".[5] (Tr. 627-28.)

*C. Summary of the Relevant Medical Evidence*

On February 23, 2004, Turk saw Dr. Madhav Bhat, a neurologist, for complaints of left ocular pain and right leg paresthesias and weakness. (Tr. 245-46.) Her visual acuity was 20/25 in both eyes with intact peripheral fields. (Tr. 245.) Dr. Bhat deduced that her right leg paresthesias were probably attributed to her relapsing-remitting MS. (Tr. 245.) He urged her to work on her written application for indigent Copaxone therapy, which he had prescribed five months earlier, and started her on Prozac for stress. (Tr. 245-46.)

In August 2005, Dr. Lawrence Wuest, Turk's family practitioner, noted that her MS was stable. (Tr. 291.) He prescribed diet and exercise for her obesity. (Tr. 291.)

On November 9, 2005, Turk reported to Dr. Bhat that she had worsening bilateral arm and hand paresthesias, felt off-balance when attempting to stand, and fatigued easily. (Tr. 267.)

---

[4] Copaxone is an injectable therapy used to reduce the frequency of relapses in relapsing-remitting MS. *See* COPAXONE, http://www.copaxone.com (last visited September 29, 2010).

[5] Turk's husband and mother also testified at the hearing, corroborating Turk's testimony of problems with balance, fatigue, and memory. (Tr. 642-48.)

4

She had not yet started the Copaxone. (Tr. 241-46.) Turk's physical examination findings were generally normal, except for some spinal numbness when bending forward. (Tr. 168.) An MRI of the brain showed diffuse white matter lesions consistent with MS and her prior study, except one new plaque at the anterior left parietal lobe. (Tr. 228.) Dr. Bhat again prescribed the Copaxone therapy. (Tr. 168.)

In December 2005, Turk complained to Dr. Bhat that the Copaxone was causing welts; he advised her to take Benadryl. (Tr. 224.) Two months later, Turk requested medication for depression and headaches, and Dr. Bhat again prescribed Prozac. (Tr. 223.) On February 24, 2006, Turk complained to Dr. Bhat of fatigue, arm and leg paresthesias, gait imbalance, and frequent headache with nausea. (Tr. 216.) Dr. Bhat found that portions of her neurological symptoms were attributed to MS. (Tr. 217.)

In April 2006, Turk saw Dr. Daniel Hauschild for a mental status examination at the request of Social Security. (Tr. 249-53.) Her affect and mood appeared depressed and labile, her intellectual functioning within normal limits, and her thought processes logical. (Tr. 252.) She reported visual and auditory hallucinations. (Tr. 253.) He diagnosed her with amnestic disorder NOS; major depressive disorder ("MDD"), moderate, single episode; and learning disorder NOS, and assigned her a Global Assessment of Functioning ("GAF") score of 49 (major impairment).[6]

---

[6] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). The higher the GAF score, the better the individual's psychological, social, and occupational functioning. A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* And, a GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school

(Tr. 253.)

On May 3, 2006, Turk reported to Dr. Lawrence Wuest, her family practitioner, that she felt agitated. (Tr. 286.) He discontinue the Prozac and started her on Effexor. (Tr. 286.)

On May 18, 2006, Turk was examined by Dr. H.M. Bacchus at the request of Social Security. (Tr. 254-56.) On clinical exam, Turk's gait appeared slightly antalgic. (Tr. 254.) He diagnosed her with relapsing-remitting MS, history of optic neuritis, and depression. (Tr. 254.) She was currently stable. (Tr. 255.) He thought that she could perform light duty work involving standing four hours in an eight-hour workday and lifting five pounds. (Tr. 255.)

On June 8, 2006, Dr. Michael Brill, a state agency physician, reviewed Turk's record and concluded that she could lift ten pounds frequently and twenty pounds occasionally; sit, stand, or walk for about six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to wetness, machinery, and heights. (Tr. 275-82.) His opinion was later affirmed by a second state agency physician. (Tr. 274.)

On July 31, 2006, Turk underwent memory testing (the Wechsler Memory Scale) by Barbara Gelder, Ph.D., at the request of Social Security. (Tr. 257-59.) She diagnosed Turk with dysthymia, probable generalized anxiety disorder, probable attention deficit hyperactivity disorder, learning disability, and probable low average/borderline cognitive functioning. (Tr. 257-59.) She assigned her a current GAF of 55 (moderate symptoms) and a past GAF of 65 (mild symptoms). (Tr. 257-59.)

Turk saw Dr. Wuest on August 7, 2006, reporting that she was unhappy with Effexor

---

functioning, but "generally functioning pretty well." *Id.*

because it caused weight gain and was not helping. (Tr. 285.)  He prescribed Lexapro. (Tr. 285.)

On September 5, 2006, Donna Unversaw, Ph.D., a state agency psychologist, reviewed the record and determined that Turk did not have a severe mental impairment. (Tr. 260-72.)  In doing so, Dr. Unversaw considered the results of Turk's memory testing, that she had attended a year of college, and that she had not received any psychiatric treatment. (Tr. 272.)  A second state agency psychologist later affirmed Dr. Unversaw's opinion. (Tr. 273.)

On November 16, 2006, Turk returned to Dr. Wuest. (Tr. 284.)  He noted that she was taking Lexapro and that her depression was stable. (Tr. 284.)

On February 6, 2007, Turk saw Dr. Bhat, reporting that she had stopped the Copaxone injections due to "lumps in the skin." (Tr. 353-55.)  She complained of arm and leg pain and numbness, but denied weakness or significant dystaxia; she also complained that she had memory problems and felt "mixed up". (Tr. 354.)  Dr. Bhat observed that Turk had a normal physical examination, a fair affect, and a normal recall test. (Tr. 354.)  He thought that a large fraction of her memory disturbance and confusion was attributable to anxiety and depression, rather than MS. (Tr. 354.)  An EEG was normal, and an MRI of the brain showed no significant change from her November 2005 study. (Tr. 351-52.)  Dr. Bhat opined that Turk's brain was stable and advised her to resume the Lexapro and Copaxone. (Tr. 346, 354.)

On March 26, 2007, Turk saw Dr. Wuest for continued depression and memory loss. (Tr. 386.)  On physical exam, she had very slight weakness in her right leg. (Tr. 386.)  He saw her again the next month and began to transition her from Lexapro to Zoloft. (Tr. 378.)

On or about May 2007, Turk began to receive mental health counseling from Kenneth Shields, a mental health counselor. (Tr. 316.)  She periodically attended counseling with Dr.

7

Shields through June 2008. (Tr. 304-05, 311-12, 467-68.)

Turk returned to Dr. Bhat on May 14, 2007, reporting some modest improvement in her depression and stress. (Tr. 339.) Her physical examination was generally normal, and he continued her Zoloft and Copaxone. (Tr. 340-43.)

On July 13, 2007, Turk underwent a neuropsychological consultation with Ronald Williams, Ph.D. (Tr. 313-14.) He suspected borderline intellectual functioning. (Tr. 313-14.) She completed an MMPI-II, which supported severe levels of depressive symptomology, social introversion, and a tendency for her to express her psychological problems in terms of physical and cognitive complaints. (Tr. 314.) He urged her to continue with counseling. (Tr. 314.)

On July 31, 2007, Turk was seen by Dr. Bhat's nurse. (Tr. 335-36.) Her energy level was adequate, her gait steady, and her strength 5/5; her mentation and cognition appeared intact. (Tr. 336.) Turk confided that she thought most of her depression and anxiety was attributable to her marriage and financial problems. (Tr. 336.) Turk saw Dr. Wuest the next two months and reported that the Zoloft was "working very well." (Tr. 367.)

In October 2007, Turk returned to Dr. Williams for more neuropsychological testing. (Tr. 306-08.) He noted that her mood had significantly improved with medication and counseling. (Tr. 305, 309.) The Dean-Woodcock Sensory Motor Battery showed mild impairment of near visual acuity in the right eye, mild dysnomia, mild impairment of auditory perception in both ears, mild impairment of tactile perception necessary to perceive and interpret complex tactile stimulation presented to the hands, and moderate problems in fine motor coordination in the upper extremities. (Tr. 307.) In the Repeatable Battery for the Assessment of Neuropsychological Status, Turk scored in the mildly to moderately impaired range. (Tr. 307.)

Her immediate memory was mildly impaired, visual special construction skills were "moderately impaired due to poor fine motor coordination", language fluency was in the low average range, attention span was moderately impaired, and delayed memory was in the normal range. (Tr. 307.) The MMPI-II showed a significant elevated depression scale. (Tr. 307.) He noted that she showed indications of rather severe depression and needed to continue counseling. (Tr. 307.)

On November 9, 2007, Turk was seen by a nurse at Dr. Bhat's office. (Tr. 331-32.) She had been off Copaxone and noticed a worsening in her balance and bowel and bladder control. (Tr. 331-32.) She reported occasional paresthesias in her hands, difficulty with walking long distances, and frequent fatigue. (Tr. 331.) The nurse continued Turk's medications, discussed compliance with Copaxone, and prescribed increased activity and exercise. (Tr. 332-33.)

One week later, Dr. Bhat completed a medical source statement for Turk, listing her symptoms as fatigue, balance problems, numbness, sensory disturbance, difficulty with memory, and depression. (Tr. 320-25.) He opined that her prognosis was fair, that her symptoms would be severe enough to interfere with her attention and concentration only on a seldom basis, and that she was capable of low stress work. (Tr. 320-25.) He opined that Turk could lift ten pounds frequently and twenty pounds occasionally; walk four to five blocks at a time; sit or stand for two hours at a time; stand or walk for at least four hours in an eight-hour workday; sit for at least six hours with the ability to shift positions at will; climb ladders occasionally; and frequently twist, stoop, crouch, and climb stairs. (Tr. 320-25.) She would need to take unscheduled fifteen to twenty minute work breaks about three to four times per day. (Tr. 320-25.) He opined that she had no significant limitations in reaching, handling, or fingering. (Tr. 320-25.) She should, however, avoid concentrated exposure to extreme heat, humidity, and hazards. (Tr. 320-25.) He

9

further opined that she would miss more than four days per month due to her impairments. (Tr. 320-25.)

In February 2008, Turk returned to Dr. Bhat, complaining of continued depression and occasional bladder incontinence. (Tr. 327-28.) He continued her Copaxone, increased her Zoloft, ordered a psychiatric consultation, and stated that vocational rehabilitation would be beneficial. (Tr. 328.)

On March 6, 2008, Turk underwent a psychiatric evaluation by Dr. Frank Shao. (Tr. 359-60.) She reported visual hallucinations, decreased energy, increased sleep, feelings of hopelessness, and occasional suicidal feelings. (Tr. 359-60.) He diagnosed her with recurrent major depression, prescribed Wellbutrin, and assigned her a GAF of 40 (major impairment) to 50 (serious symptoms). (Tr. 359.) One month later, Turk reported to Dr. Shao that she was "a lot calmer" and "happier" with no side effects from her medications. (Tr. 358.) He diagnosed her with MDD, in partial remission. (Tr. 358.) In May 2008, Turk told Dr. Shao that she felt less depressed; he noted, however, that she had a constricted affect and looked anxious. (Tr. 520.) He diagnosed her with MDD, mood instability, and adjusted her medications. (Tr. 520.) In June and July 2008, Turk reported to Dr. Shao that she was laughing more and was less irritable. (Tr. 518-19.)

On July 9, 2008, Turk saw a nurse at Dr. Bhat's office. (Tr. 486-87.) There were no significant changes in her functioning relating to her MS. (Tr. 486-87.) On August 25, 2008, an MRI of Turk's brain showed no change from her February 2007 study. (Tr. 476-77.)

In October 2008, Turk saw Dr. Scott Palmer, a urologist, for mild stress incontinence. (Tr. 500.) He later surgically inserted a urethral sling, which she tolerated well. (Tr. 490-92.)

That same month, Turk complained to Dr. Shao of crying spells, some depression, and irritability, and he noted that she had a constricted affect. (Tr. 517.) He maintained his diagnosis of MDD, in partial remission, and adjusted her medications. (Tr. 517.) The next month, Turk reported feeling better, and Dr. Shao reported that she had a bright affect and normal speech, noting that Turk's MDD was "mostly remitted." (Tr. 516.)

## IV. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## V. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[7] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the

---

[7] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On February 17, 2009, the ALJ rendered his opinion. (Tr. 25-36.) He found at step one of the five-step analysis that Turk had not engaged in substantial gainful activity since her amended alleged onset date of March 10, 2006. (Tr. 27.) At step two, the ALJ concluded that Turk had the following severe impairments: relapsing-remitting MS with complaints of bilateral upper and lower extremity numbness, balance problems, slurred speech, and fatigue; history of optic neuritis associated with MS, with relative current stability; obesity; amnestic disorder, depressive/dysthymic disorder, probable anxiety disorder, possible attention deficit hyperactivity disorder, and learning disability. (Tr. 27.)

At step three, the ALJ determined that Turk's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 27.) Before proceeding to step four, the ALJ determined that Turk's testimony of debilitating limitations was not credible and that she had the following RFC:

> [T]he claimant has the residual functional capacity for "light" work . . ., reduced as follows: stand and/or walk, in combination, only a total of four out of 8 hours in an 8 hour workday[;] sit/stand option . . .; only occasionally climbing ramps and stairs, balancing, stooping, kneeling, and crouching; never climbing ladders, ropes, or scaffolds; no constant near or close visual work; no constant oral communications; avoid exposure to wetness and hazards . . .; limited to simple, routine, repetitive tasks; no fast-paced or strict production requirements; few, if any, workplace changes; and no jobs where reading, spelling, or math calculations are an essential part of the job.

(Tr. 27-28.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Turk was unable to perform any of her past relevant work. (Tr. 35.) The ALJ then concluded at step five

that Turk could perform a significant number of unskilled, light jobs within the economy, including laundry folder, bagger of garments, and inspector/hand packager. (Tr. 36.) Therefore, Turk's claims for DIB and SSI were denied. (Tr. 36.)

*C. The ALJ's Credibility Determination Must Be Remanded*

Here, Turk asserts that the ALJ improperly discounted the severity of her subjective symptoms. Turk's assertion is persuasive, as the ALJ was "patently wrong" with respect to a material portion of his credibility analysis and this error necessitates a remand of his decision.

To begin, because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

Here, the ALJ found that Turk's impairments could reasonably be expected to cause her alleged symptoms, but the statements made by her, her husband, and her mother concerning the intensity, persistence, and limiting effects of these symptoms were "not credible to the extent they are inconsistent" with the RFC he assigned. (Tr. 30.) The ALJ then went on to pen four pages about Turk's medical history, in the process encompassing several reasons why he

14

discounted Turk's credibility.

As a threshold matter, the parties disagree about the ALJ's actual reasons for discounting Turk's credibility. Turk perceives that the ALJ articulated five reasons for discounting her credibility, all contained in one paragraph of his decision. (Opening Br. 21-24.) The Commissioner disagrees, contending that the ALJ's credibility analysis "spans approximately four pages", suggesting instead that the ALJ discounted Turks's credibility due to a "host of factors". (Resp. Br. 22.)

Of course, an ALJ must be "sufficiently specific" about the reasons for his credibility determination. SSR 96-7p; *see Steele v. Barnhart,* 290 F.3d 936, 942 (7th Cir. 2002); *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004); *Osborn v. Astrue*, No. 08 C 7395, 2010 WL 2772480, at *12 (N.D. Ill. July 12, 2010); *Ross v. Astrue*, No. 08-C-450, 2009 WL 742761, at *3 (E.D. Wis. 2009) ("An ALJ's credibility finding must be justified with specific reasons."). The fact that the parties cannot even agree on the particular reasons that the ALJ discounted Turk's credibility suggests a lack of specificity with the ALJ's reasoning. Indeed, the reasoning of a credibility determination that "spans approximately four pages" of the ALJ's decision by its very nature is more difficult to trace. *See generally Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (explaining that when making a credibility determination, an ALJ must "build an accurate and logical bridge between the evidence and the result"). Of course, as a general rule, "no court should be forced to engage in speculation as to the reasons for an ALJ's decision." *Hemphill v. Barnhart* , No. 01 C 6556, 2002 WL 1613721, at *8 (N.D. Ill. July 18, 2002) (citation omitted).

In any event, the parties agree that one of the reasons that the ALJ discounted Turk's credibility was because of an alleged lack of objective evidence to support her testimony that she

15

has difficulty with fine motor coordination, causing her to drop items. (*See* Tr. 623-24 ("I have had problems that I drop stuff. . . . "When I go to pick up things, there's sometimes I can't grasp it. It takes a couple times to pick it up.").) Specifically, the ALJ rejected Turk's claim of fine motor coordination problems, stating: "There is no objective medical evidence and no medical opinion of record to corroborate the claimant's allegations of difficulty with handling and fingering movements." (Tr. 34.)

However, as Turk emphasizes, the ALJ was "patently wrong" in making this statement. *See Powers*, 207 F.3d at 435. On October 16, 2007, Dr. Williams, Turk's neuropsychologist, administered the Dean-Woodcock Sensory Motor Battery, the results of which indicated that Turk had a *moderate impairment* in fine motor coordination and a *mild impairment* of tactile perception necessary to perceive and interpret complex tactile stimulation presented to the hands. (Tr. 307.) He also administered the Repeatable Battery for the Assessment of Neuropsychological Status, the results of which indicated that Turk's visual spatial construction skills were *"moderately impaired due to poor fine motor coordination."* (Tr. 307.) Dr. Williams opined that these deficits were "secondary to her MS." (Tr. 307.) Therefore, the ALJ mischaracterized the objective medical evidence of record with respect to Turk's fine motor coordination, creating a flawed credibility determination.

While the Court notes that the ALJ provided a number of other valid reasons for discrediting Turk's testimony, his misstatement with respect to her fine motor coordination, however, cannot be deemed as mere harmless error. *See Skarbek*, 390 F.3d at 504 (concluding that an ALJ's error was harmless when it "would not affect the outcome of the case"). This is because it could have an impact on the ALJ's step five determination that there were a

significant number of jobs that Turk could perform. The VE testified that if Turk's testimony about her problems with grasping, gripping, and fine motor coordination were totally credible, this would create "a problem" in that there may be no jobs that she could perform. (Tr. 657-58); *see generally* 20 C.F.R. §§ 404.1566(b), 416.966(b) ("Work exists in the national economy when there is a significant number of jobs . . . having requirements which you are able to meet with your physical or mental abilities and vocational qualifications.").

Of course, if Turk in fact has moderate deficits in fine motor coordination as Dr. Williams suggested, it is conceivable that it could impact her ability to perform the three jobs specifically identified by the ALJ at step five in his decision—laundry folder, bagger of garments, and inspector/hand packager. Significantly, as explained earlier, the Commissioner, not Turk, bears the burden of proof at step five. *See Clifford*, 227 F.3d at 868.

Admittedly, as the Commissioner emphasizes, the ALJ relied at least in part upon several other medical sources of record—Dr. Bhat and the state agency physicians—who opined that Turk did *no*t have any significant fine motor coordination deficits. (Tr. 33.) And, the ALJ also noted that there was no indication in the record that Turk had any significant loss of muscle or grip strength, and that an EMG of her upper extremities was normal. (Tr. 33.) However, considering the results of Dr. Williams's objective testing, a material conflict of record exists concerning Turk's ability to perform tasks requiring fine motor coordination that the ALJ failed to confront and resolve.

In that regard, as this Court frequently reiterates, "it is the ALJ's role to weigh the conflicting medical evidence and resolve the conflicts." *Fenker v. Astrue*, No. 1:08-cv-231-TS, 2010 WL 406061, at *15 (N.D. Ind. Jan. 25, 2010) (citing *Richardson v. Perales*, 402 U.S. 389,

399 (1971)). The Court will not "reweigh the evidence, *resolve conflicts*, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Clifford*, 227 F.3d at 869 (emphasis added); *see Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (same). "Where conflicting evidence allows reasonable minds to differ, the responsibility for resolving the conflict falls on the ALJ, not the court." *Lee v. Barnhart*, No. 01 C 2776, 2003 WL 260682, at *5 (N.D. Ill. Feb. 6, 2003) (citing *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990)). In that same vein, the ALJ may not sidestep a conflict by selecting and reviewing only the evidence favorable to his decision. That is, he must not ignore evidence which contradicts his opinion, but rather, must evaluate the record fairly. *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). Here, the ALJ failed to fairly evaluate the record concerning Turk's alleged deficits in fine motor coordination.

In sum, because the ALJ was "patently wrong" with respect to the portion of his credibility analysis concerning Turk's complaints of impaired fine motor coordination, and because Turk's alleged fine motor deficits could potentially affect the outcome of the case by reducing the number of jobs she is able to perform at step five, the ALJ's credibility determination must be remanded.[8]

## VI. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this

---

[8] Because a remand is warranted with respect to the ALJ's credibility determination, the Court need not reach Turk's remaining two arguments—that the ALJ improperly evaluated Dr. Bhat's opinion and committed legal error by failing to use the "special technique" to assess Turk's mental impairments.

Opinion and Order. The Clerk is directed to enter a judgment in favor of Turk and against the Commissioner.

SO ORDERED.

Enter for this 4th day of October, 2010.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge